Botsford, J.
Introduction
The plaintiffs Douglas Environmental Associates, Inc. and Vincent Barletta (collectively referred to as DEA) bring this action to challenge the repeated denials by the Department of Environmental Protection (the department) of a permit to construct an integrated landfill facility in Douglas, Massachusetts. DEA began its efforts to secure the necessary agency approvals for the landfill project in 1987; the department’s latest decision denying the necessary construction permit is dated September 22, 1995.
One count of DEA’s amended complaint seeks review of the department’s decision denying the operating permit pursuant to G.L.c. 30A, §14, and presently before the court is DEA’s motion for partial summary judgment on this count. The department has filed the voluminous administrative record with its answer. DEA argues that the 1995 permit denial must be reversed because, inter alia, it is unsupported by substantial evidence, arbitrary and capricious, and based on error of law. The department and the intervenor-defendants, the Town of Webster and eighteen citizens who represent themselves and Citizens for a Clean Environment, an unincorporated association (collectively referred to as the intervenors), argue that the department’s decision should be affirmed. For the reasons discussed below, DEA’s motion for partial summary judgment is allowed.
Background[3]
What DEA proposes to build is an integrated solid waste management facility that would include landfilling, recycling and composting operations. The facility would be built on 982 acres of industrially zoned, wholly undeveloped land which DEA owns in Douglas, abutting the Douglas state forest. The proposal further calls for the facility to -be developed in four phases, with each phase allowing approximately five years of operating capacity. The permit at issue here relates to phase one of the facility’s landfill operation, and if granted, would authorize the construction of a 35 acre landfill with seven cells and related structures.[4]
The siting of and approval of permits for waste disposal facilities is governed by G.L.c. 111, §150A. As indicated, DEA initiated the multi-phase administrative process to obtain permission to build the landfill facility in 1987, beginning with site assignment proceedings before the Douglas board of health.[5] Since 1992, DEA has been before the department seeking the necessary permit to construct the landfill facility. The history of the department’s dealings with DEA since September 1992 has been quite extraordinary in many respects, but one of its significant attributes is its length.
1. The September 1992 draft permit and the April 1993 final permit denial.
In September 1992, the department granted DEA a draft landfill construction permit for phase one of the *525 project. This draft proposed to allow DEA to accept 1500 tons per day of solid waste, of which 600 tons per day could be municipal solid waste (residential, commercial and institutional waste). The issuance of the draft permit was followed by two public hearings and the submission of many comments and much information to the department in connection with DEA’s construction permit application. The record reveals that there has been substantial and often intense local opposition to the proposed facility, as well as opposition from other quarters, including the department.
In April 1993, the department issued a final decision denying the permit. Its denial was based on two issues: (1) the hydrogeological aspects of the project, and in particular, the claimed failure of DEA to determine accurately the site characteristics and to demonstrate that the environmental monitoring system was adequate; and (2) the claimed failure of DEA to show that the project would not constitute a threat to certain identified endangered species and species of special concern under the Massachusetts Endangered Species Act (MESA), G.L.c. 131A.[6] On both points, the department concluded that more studies would need to be completed and submitted by DEA, and without them, no permit could be issued.
In a memorandum of decision dated December 9, 1993, I allowed DEA’s motion for partial summary judgment seeking reversal of the department’s 1993 permit denial under G.L.c. 30A, §14. The basis of the decision was that the department had violated DEA’s due process rights by basing its decision on reports and information that either were never made available to DEA for comment before the permit denial was issued, or were submitted too late for DEA to comment on. The case was remanded to the department for further proceedings, and specifically to allow DEA (and other interested parties) a full opportunity to respond to the hydrogeological reports and the letter from the Division of Fisheries and Wildlife (DFW)[7] which had played a significant role in the department’s decision. (Administrative Record [A.R.], ex. S41.)
2. The January 13, 1995 partial decision.
Although the remand decision was issued in December 1993, the department did not reopen the public record for public comment until March 1994. The public comment period in fact ran from March 30, 1994 to June 1994, and was reopened by the department to run again from July to August 16, 1994. The department then reviewed all the public comments it received, including further hydrogeological reports submitted by DEA and reports on rare species surveys conducted on DEA’s behalf, for the next five months.
The administrative record reveals that in December 1994, Thomas Powers, then the Acting Commissioner of the department, wrote a memorandum to Trudy Coxe, the Secretary of Environmental Affairs, in which he stated that (1) the department’s staff were now “reasonably convinced” the site was adequately monitorable from a hydrogeological point of view, and (2) DEA had established, to the satisfaction of DFW as the concerned agency, that the rare species on which the department had based its April 1993 permit denial were not present on the site, although DEA had discovered the presence of marbled salamanders, a threatened but not endangered species, and spotted turtles, a species of special concern. The memorandum went on to state:
DFW has submitted a letter adopting the [DEA] consultant’s conclusions on species identification and their suggestion that the species and the landfill can co-exist provided buffer zones are established and physical barriers constructed between the breeding grounds and landfill footprint. Given DFW’s position, the realization there are no endangered species, the availability of surrounding suitable habitat and the general difficulty in justifying permit decisions on species issues, I don’t believe a permit denial should rest solely on salamander or turtle habitat considerations . . .
(A. R. ex. 1 .)[8]
The memorandum then turned to the issue of disposal capacity need. The Acting Commissioner stated a belief that the department could reopen the issue despite the fact that the 1993 permit denial did not touch upon it, and outlined an “alternative approach” to capacity need based on a “permitting hierarchy” where land fill “mining and expansion projects would require consideration over a proposal [like DEA’s] that would despoil open space.” (Id.) The memorandum offered two options with respect to the upcoming DEA permit decision:
1) Reopen public comment period on statewide need for and allocation of disposal capacity, as well as endangered and/or threatened species. During public comment period aggressively negotiate site purchase price and secure Administration approval to acquire site for open space once final permit decision is made.
2) Approve the proposal because the issues raised in the April 1993 denied have been resolved; further conditions concerning threatened species would be necessary. This is the option recommended by the Regional Director [for the department’s region in which the proposed facility would be located]. As with Option 1, negotiate purchase price and secure Administration approval to acquire site for open space.
(A.R., ex. 1.)
Thereafter, a draft of a final permit decision for the facility was prepared in apparent accordance with the second option just quoted: the draft grants the permit, with conditions relating, inter alia, to hydrogeology and threatened species; as to the latter, one of the conditions proposed was that DEA would conduct a *526 population and migration study of the marbled salamander before any construction began, to determine the location and extent of a necessary protective buffer zone. On the issue of waste disposal capacity for the facility, the draft proposes to authorize DEA to accept no more than an average of 1500 tons per day of solid waste, of which 600 tons per day could be municipal solid waste.[9] The draft is dated December 20, 1994. (A.R. ex. 27.)
The department did not issue a draft final permit decision in accordance with this draft. Instead it issued a “partial decision,” dated January 13, 1995. As Commissioner Powers had indicated (A.R. ex. 1), the partial decision concluded that the reasons for the permit denial in April 1993 had been resolved: the department had determined that adequate environmental monitoring at the site could take place; and based on DEA’s site survey for threatened species, the reported copperhead, wood turtle and box turtle were not present on the site. Nevertheless, because the same site survey had revealed two other protected species on or close to the site — the marbled salamander (Ambystoma opacumj, listed as a “threatened” species under MESA, and the spotted turtle (Clemmys guttata), listed as a species of “special concern” — the department determined that before a final decision on the permit could be made, DEA must undertake additional studies “to evaluate the extent of the environmental impacts of the landfill construction and operation on the protected species.” In addition, the department concluded that it should revisit the issue of the need for the project, focusing on whether there was still a need for additional capacity to dispose of municipal solid waste, and, if so, whether a new general methodology for allocating the necessary capacity among waste disposal projects should be used. (A.R. ex. J1.) The department announced that it would open a public comment period on both the threatened species and the disposal capacity need questions following the submission of DEA’s additional protected species studies.
Following the issuance of the department’s partial decision, DEA filed a motion in this court to enforce the original remand order of December 9, 1993; DEA’s position was that the department was not authorized to consider the question of facility or disposal capacity need on remand. In a decision dated June 27, 1995,1 concluded that although the department’s return to the once-resolved issue of need at this late stage of the administrative process was very troubling, because there was a suggestion of changed circumstances the department at least would be permitted to solicit and accept comments on the issue of need for the new facility in accordance with the criteria set out in the its existing regulations. The ruling also required the department to issue its final permit decision within 45 calendar days following the close of the 30 day public comment period. (Memorandum and Order on Motion to Enforce Remand Order, A.R. ex. S42.)
3. The September 22, 1995 permit denial.
The final public comment period ended on August 10,1995, some twenty months following the December 1993 remand order. During the public comment period, DEA submitted a multi-volume report of its studies of the marbled salamander and spotted turtle in relation to the facility site, as well as studies of ground water issues related to the animals’ habitat. (A.R. ex. 55, 56, 57.) In connection with the marbled salamander, sixteen of which had been located near the facility site, DEA proposed a number of mitigation measures, including (1) a 250 or 282 foot buffer zone between the western boundary of the facility site and ephemeral or vernal pools to the east of the site, at least one of which had been identified as a breeding pool for the marbled salamander; (2) a low “salamander wall” around the western perimeter of the facility to prevent the salamander from entering the site and to deflect its travel to upland habitat elsewhere; and (3) a perimeter fence around the whole property. DFW submitted a letter recommending denial of the permit on account of the marbled salamander, because in DFW’s view the DEA studies were inadequate and so were its proposed protective measures. Other submissions recommending denial because of the marbled salamander included a report from a biologist representing the intervenors and a letter from a representative of the Audubon Society.[10]
The administrative record indicates there was much internal debate about the question of what the department’s final decision should be. A memorandum to the commissioner of the department from Neil O’Leary, the director of its central regional office— which covers the area where the facility site is located — suggests that despite his personal views he and the staff of that office believed the record required issuance of a permit with conditions to protect the marbled salamander and deal with associated hydrogeological concerns related to construction. On the issue of the marbled salamander, O’Leary notes:
There appears to be some scientific differences on the buffer zone [to protect the marbled salamander]. A difference that is not uncommon to environmental projects. In the DEA proposal reasonable people would agree that a buffer zone or corridor to nesting/mating locations for the marbled salamander should be provided for this species of special concern. However, the exact dimensions, restrictions and specificity are subjects of negotiation among the experts that the [department] incorporates into an issued permit to construct or to operate . . .
... I make the offer to sign a permit with conditions. Not out of any ulterior or noble reason, but simply to do that action which represents the staffs efforts and recommendations. Obviously, I could not pro *527 fessionally support an outright denial of the permit application.
(A.R. ex. 2, pp. 2, 3.) Similar to January 1995, staff of the department prepared a “discussion draft” of a final decision. The draft proposed that the department grant the permit with conditions concerning protection of the marbled salamander and in particular requiring the establishment of a 640 foot buffer zone between the vernal breeding pool(s) and the western edge of the facility footprint. (A.R. ex. 58.)
On September 22, 1995, the department issued its final decision, in which it denied the permit once again. The basis of the denial was the department’s determination that DEA had failed to show the proposed facility would not constitute a threat to the marbled salamander. The decision states that at a minimum a 640-foot buffer on the eastern side of the three vernal ephemeral or vernal pools located near the western edge of the proposed facility footprint would be required to protect the marble salamander, and indeed a 1000-foot buffer on the east of each pool would be more appropriate. If such a buffer were created, however, “the design changes would be so significant, it is not practicable for [the department] to issue . . . apemiit.” (A.R. ex. S1, p. 13; see id., p. 14.) The decision also determines that the permit must be denied because construction of the landfill as proposed would disturb the upland feeding and migratory habits of the marbled salamander which would constitute a prohibited “taking” of the salamander in violation of MESA, G.L.c. 131A, §2. Finally, the decision states that although the permit is being denied because of threatened species issues, if the department were to reach the question of disposal capacity need, it would conclude, premised on its estimate of statewide disposal capacity in 1996 and 2000, that DEA could accept 1500 tons per day of nonmunicipal solid waste, but no municipal solid waste at all. (A.R. ex. S1, pp. 14-19.)
5. Proceedings following the September 1995 permit denial.
After the department issued its final decision denying tire permit, DEA undertook to obtain access to additional documents held by the department and the Executive Office of Environmental Affairs which related to the DEA permit application process and the department’s decisions. When the department and executive office.refused to disclose certain documents on the basis of several exemptions set out in G.L.c. 4, §7, clause 26, DEA brought a motion under G.L.c. 66, §10, to require disclosure. That motion was heard in late December of 1995, and thereafter I reviewed all of the contested documents. I ordered some of the contested documents or portions of them disclosed in January or February of 1996. Following this procedural round, there was another one on the question whether certain of the documents obtained by DEA through the public records process should be added to the administrative record of this case for purposes of the present review under G.L.c. 30A. In June 1996, I ordered some of the proposed documents to be added to the administrative record. The parties then briefed the c. 30A review issues, and argued them in late November 1996.
Discussion
Under G.L.c. 111, §150A, the administrative proceedings before the department concerning the facility construction and operating permit are not adjudicatory proceedings, but the statute provides that judicial review of the department’s permit decision is governed by G.L.c. 30A, §14. In reviewing an agency decision under this section, the court is required to give due weight to the agency’s experience, technical competence, specialized knowledge and statutorily conferred discretion. G.L.c. 30A, §14(7). Brookline v. Commissioner of the Dep’t of Envt’l Quality Eng’g, 398 Mass. 404, 410-11 (1986). See Flint v. Commissioner of Public Welfare, 412 Mass. 416, 420 (1992). The function of the court is to consider the entire administrative record and to sustain the department’s decision unless DEA meets its burden of showing that the decision is unsupported by substantial evidence, unreasonable, arbitrary or capricious. See Langlitz v. Board of Registration of Chiropractors, 396 Mass. 374, 379 (1985). “Substantial evidence” is such evidence that a reasonable mind might accept as adequate to support a conclusion. G.L.c. 30A, §1(6). Substantial evidence must be evaluated in the light of contradictory evidence which fairly detracts from the weight of the evidence upon which the agency relied. Cohen v. Board of Registration in Pharmacy, 350 Mass. 246, 253 (1966). “Significantly, [the court] is not required to affirm the [department] merely on a finding that the record contains evidence from which a rational mind might draw the desired inference. Our determination must be made ‘upon consideration of the entire record.’ " New Boston Garden Corp. v. Board of Assessors of Boston, 383 Mass. 356, 466 (1981), quoting Cohen, supra.
The department’s permit denial was based on what it deemed the inadequate protection afforded the marbled salamander in DEA’s plans, supplemented by its determination that DEA in any event would not be allowed to accept any municipal solid waste. The discussion below considers first the marble salamander issues and second the question of disposal capacity need.
I. The Marbled Salamander
A. The Administrative Record
In June of 1993, Herpetological Associates, Inc. (HA), a firm DEA retained as a consultant on the threatened species issues that had been raised in the department’s April 1993 permit denial, conducted a rare species study on the DEA property. As indicated above, that study found none of the endangered species the department had been concerned about, but *528 did locate two adult marbled salamanders, one to the northwest of but near the proposed site for the landfill facility and one to the southwest of the proposed site and two larval salamanders[11] in an ephemeral or vernal pool also located near but to the west of the proposed facility site. It appears that salamander eggs were found in another ephemeral pool in the same vicinity. HA also located two female spotted turtles off the DEA property, but close by. (See A. R. ex. J43.)
The marbled salamander is a State-listed “threatened” but not an “endangered” species under MESA. (See G.L.c. 131A, §1, which defines both terms.) It is not a Federally-listed threatened or endangered species under the Federal Endangered Species Act of 1973. The spotted turtle is a State-listed “species of special concern” under MESA, and thus neither “endangered” nor “threatened.” (See G.L.c. 131A, §1, defining the term.) In connection with the marbled salamander, HA recommended in its 1993 report that a baseline study be conducted before any construction commenced, to enable those concerned to make a reasonable estimate of the marbled salamander population for monitoring purposes as the facility construction activities were undertaken. It also recommended the creation of a buffer zone around all the wetland areas in the vicinity of the proposed facility, and the construction of a “salamander wall” — a low wall of smooth concrete or similar material — around the portions of the proposed facility closest to the ephemeral ponds, to keep the marbled salamander out of the facility site and resulting harm. Finally, HA recommended that the marbled salamander population be closely monitored for five years after construction to determine the effect, if any, of the construction and the landfill project on the species. (A.R. ex. J41.)
During the reopened administrative proceedings following the December 1993 remand order, DEA submitted the 1993 rare species report prepared by HA, as well as a separate report of recommendations concerning mitigation measures, prepared by HA in April 1994. (A.R. ex. J43.) In response to an inquiry from the department, DFW commented on HA’s rare species report and recommendations in two letters dated April 21 and May 23, 1994 respectively. In the first letter, DFW states that the rare species surveys which HA had conducted were appropriately done, and insofar as the copperhead snake, box turtle and wood turtle were concerned, the HA report satisfied the department’s responsibilities under MESA. With respect to the marbled salamander, the letter indicates that HA’s finding was significant because there were not many documented “occurrences” of the species in Massachusetts. Given where the salamanders were found and given the- location of the vernal breeding pools in relation to the proposed facility site, the DFW letter “strongly” recommends that population and movement studies
... be conducted to determine what impediments to migration may exist under the current site configuration, and to develop baseline data for the purpose of monitoring the success of the population over the long-term. These preliminary studies should occur prior to the development of the western portion of the proposed landfill site. The configuration of the western portion of the proposed landfill should be dictated by these studies as well as the placement of the “salamander wall” as proposed by HA. The specifics of this action should be developed in consultation with the program [the natural heritage & endangered species program of DFW).
We concur with all other recommendations as outlined by HA . . . [in] the report, with the addition of the placement and monitoring of the pitfall traps on the internal side of the “salamander wall” for Marbled Salamanders potentially trapped within the “limit of disturbance” line [of the facility].
It is our opinion that if the recommendations of HA and the Program are implemented as outlined [above], the subject rare species will not be adversely affected.
(A.R. ex. J27.)
The second 1994 letter of DFW responds to a request of the department for additional information on the determination of appropriate buffer widths around wetland areas near the proposed facility as well as the possible impacts of changes in water quality on the marbled salamander. With respect to buffer widths, DFW mentions that marble salamanders breed in the fall in vernal pool breeding sites, and once the breeding and “egg-rearing" activities are completed, the adult marbled salamanders migrate back to the surrounding upland areas an average distance of 600 to 700 feet. DFW goes on to say, “[t]his mean migration distance for Marbled Salamanders would indicate that a 300 foot wetlands buffer would be the minimum acceptable protective buffer distance between wetlands and landfill activities. However, some individuals will migrate further, some less.” In light of the fact that the adult marbled salamanders found by HA in 1993 were approximately 600 feet north and south of known breeding pools which were themselves close to the proposed facility site, DFW repeated the recommendation that DEA have a movement component to the pre-construction survey of the marbled salamander population, “which will help in determining what size the protective buffer should be, as well as dictate the configuration of this side of the landfill. This study must be conducted prior to the onset of any construction activities on the western portion of the proposed landfill.” (A.R. ex. J34.)
Following DFW’s two letters, HA submitted a letter stating that it concurred with the recommendation of DFW “to provide an unimpeded migration corridor to *529 the marbled salamander breeding pools.” (A.R. ex. J44, tab 3.)
DEA followed up on the DFW recommendation of a base population and movement study for marbled salamander on the DEA property. Working with DFW, HA proposed a study of marbled salamander within a “study area” designated by DFW west of the proposed facility footprint; HA conducted the study during the fall and winter of 1994-95. HA’s primaiy method of gathering site specific information was to capture and observe marbled salamanders using drift fences with pitfall traps, shelter boards, and time-constrained searches by HA staff within a predetermined area.[12] Based on the location and number of captured salamanders, HA estimated the marbled salamander population and the location of likely migratoiy routes to and from potential breeding pools or ponds.[13] From this information, HA reproposed mitigation measures which were recommended to be included in the design of the proposed facility. The results of HA’s 1994-95 study and its mitigation proposals were presented as a part of a three-volume report entitled, “Additional Rare Species Mitigation Design Studies" and submitted to the department on July 7, 1995. (See A.R. ex. S5, S6, S7.)
During the course of the HA 1994-1995 study, HA captured a total of 16 adult marbled salamanders, 8 male and 8 female, over the course of 82 days in the fall of 1994, using the drift fence and pitfall trap capture method.[14] Time-constrained searches (involving repeated dipping in the breeding pools) in October 1994, .January 1995 and February 1995 resulted in the observation of 37 larval marbled salamanders in pool 1. No larval marbled salamanders or egg masses were observed in either of the other two possible breeding pools. Of the 16 marbled salamanders captured in the pitfall traps by the drift fences, 15 were captured at the largest drift fence (drift fence 1) which was placed east between the eastern side of pool 1 and the western edge of the facility footprint. The points of capture showed six of these salamanders were northeast of pool 1, three were due east, and six were southeast. HA stated that' the marbled salamander was most likely to travel in the direction of natural swales, that there was such a swale located to the east-northeast of pool 1, and there was an even wider sloping swale on the west side of pool 1. HA surmised it was “highly likely” salamanders were also dispersing in the westerly direction, but HA did not have any drift fences in that direction because it felt that wetlands restrictions in that area essentially prevented it from installing fences to the west. HA made the judgment that all 15 salamanders captured in drift fence 1 were traveling away from the pool. The sixteenth salamander was actually captured twice; these captures were made near drift fence 2, to the west of pool 1. (A.R. ex. S5.)
In the HA 1994-95 study, three of the fifteen marbled salamanders captured in drift fence 1 were captured at a distance greater than 400 feet from pool 1. Because the pool of origin of the remaining salamander was less certain, HA speculated that it may have traveled 350 feet if it originated from pool 2, and 950 feet if it originated from pool 1. HA opined that pool 1 served as the main breeding site for the marbled salamander, that pool 3 was not suitable, and pool 2 might be an alternative breeding site in very wet years. The opinion was based on the fact that no larval salamanders or egg masses were found in pools 2 or 3 during the 1994-95 study, and pool 3 in particular froze completely in the winter, which would have made it impossible for larval salamanders to survive the winter.
Based on the results of its study, HA repeated its recommendation for the use of a salamander wall and continued monitoring of the marbled salamander during the construction, post-construction and operational phases of the facility. HA also recommended a differently-configured and wider buffer zone between pool 1 and the salamander wall at the northwest portion of the proposed facility than it had previously suggested. The recommended width of the proposed buffer zone was 950 feet, but was later changed by DEA to 982 feet. HA stated that this width would provide the marbled salamander with an appropriate “migration corridor” over which it could travel from the breeding pool to acres of suitable upland habitat to the north and southwest of the facility site.[15]
After reviewing the results of the HA 1994-95 study, a number of persons submitted materials to the department relating to the marbled salamander issue. In reaching its final decision regarding the adverse impact of the proposed facility on the marbled salamander, the department relied primarily on the three following submissions.
1. DFW 1995 letter.
On August 3, 1995, Thomas W. French, assistant director of DFW submitted comments regarding the HA 1994-95 study as well as the DEA submissions about water quality and quantity. (A.R. ex. S13.) Despite the generally positive tenor of the two DFW letters, submitted to the department in 1994, the 1995 DFW letter is uniformly critical of the HA 1994-95 study and all HA’s recommendations concerning protection of the marbled salamander. As described previously, DFW had earlier opined that a minimum buffer zone of300 feet around potential breeding pools would be necessary; in the 1995 letter, however, DFW concludes that a buffer zone of a minimum width of 640 feet — the average distance stated in a study of marbled salamanders conducted in 1973 by P.K. Williams [Williams study] — on the eastern side of pools 1, 2 and 3 would be necessary. DFW also severely criticizes the 1994-95 HA study because (l)the drift fences were not placed all the way around the three vernal *530 pools, thus leaving areas to the west of the pools where marbled salamanders could travel undetected; (2) surveying done in one year was insufficient to test the effect of hydrologic variability from year to year; and (3) in DFWs view, HA had no basis on which to conclude that pools 2 and 3 were not likely to be used by the marbled salamander as breeding sites. The DFW letter erroneously states that all 16 of the captured marbled salamanders were females captured in outgoing mode, and thus it was impossible to tell whether this was a majority of the population or a small subset. (In fact, the salamanders captured were evenly split by gender, 8 females and 8 males.) DFW recommends in the 1995 letter that DEA’s permit application be denied because of the alleged inadequacies of the HA 1994-95 study, but goes on to make a number of recommendations, which include: that the salamander wall be located at least 640 feet from the boundaries of pools 1, 2 and 3; that the undisturbed buffer zone be placed under a conservation restriction in perpetuity; and that the monitoring of the marbled salamander population continue 30 years after the landfill facility ultimately closes.[16]
2. Scott Jackson letter.
Scott Jackson, a wildlife biologist, submitted a review of the HA 1994-95 study on behalf of the intervenor, dated August 4, 1995. (A.R. ex. S16.) In his report, Jackson states that the HA 1994-95 study is “woefully inadequate,” failing to demonstrate any useful information about the population size, migratory distances of the marbled salamander, or whether pools 2 and 3 are being used as breeding pools. Jackson offers a number of suggestions about how a more adequate and complete study could and should have been designed to acquire essential information with the use of more drift fences rather than shelter boards and time-constrained sampling. He sees a potential for (1) increased adult mortality resulting from efforts to divert adult salamanders away from their preferred habitats because of longer migration distances, (2) increased salamander confusion, (3) increased exposure to predation and desiccation when salamanders become concentrated along the salamander wall. Jackson finds that the 250 foot buffer zone recommended by HA is clearly inadequate, and a 640 foot buffer zone may itself be inadequate. Based on Jackson’s determination that other types of mole salamanders in the Ambystoma genus have been known to travel greater distances, and information that juvenile salamanders of other types travel at times farther than adult salamanders, Jackson suggests that a buffer zone of at least 1000 feet should be required.[17]
3. Audubon Society Letter
On August 9, 1995, E. Heidi Roddis. an “environmental policy specialist” with the Massachusetts Audubon Society submitted a letter commenting on the rare species and, to a lesser extent, capacity need issues. (A.R. ex. S19.) The letter’s comments on rare species appear to repeat in large part the conclusions stated in the DFW 1995 letter or the report submitted by Scott Jackson, with little substantive or factual development of those conclusions, and little additional information.
In its final decision of September 22, 1995, the department determined that insofar as the marbled salamander was concerned, DEA had failed to meet its burden of satisfying the permit criteria requiring that (1) the design, construction, operation and maintenance of the facility not constitute a threat to the environment, 310 Code Mass. Regs. §19.038(2)(a)(4); and (2) the facility design and operation assure compliance with other applicable state laws, regulations and policies, 310 Code Mass. Regs. §19.038(2)(a)(5). The decision quotes verbatim, and without comment, substantial portions of the DFW 1995 letter, the Audubon Society letter, and especially Scott Jackson’s report. (See A.R. ex. S1, pp. 5-10.) It then goes on to state as “findings” that: the marbled salamander uses migratory routes leading directly into the proposed facility site; a minimum buffer of 640 feet on the eastern sides of pools 1, 2 and 3 would be required, but “given the likelihood of greater travel distances for juveniles based on studies of related salamanders and the documented greater travel distances for adults, a buffer of 1000 feet would be more appropriate”; a buffer of 250 feet, as proposed by DEA, would result in a “taking” of the marbled salamander, an act prohibited by MESA; and there is little evidence to suggest that marbled salamanders, which tend to travel in a straight path and return to the same areas each year, would be successfully redirected by the salamander wall to other suitable upland habitat. The department concludes in its decision, based on these findings, that the proposed facility poses a threat to the marbled salamander which is a threat to the environment within the scope of 310 Code Mass. Regs. §19.038(2)(a)(4), and emphasizes that DFW, the agency charged with enforcing MESA, has recommended that the permit be denied. Finally, the decision determines that since a 250 foot buffer cannot be approved and a buffer zone of at least 640 feet and preferably 1000 feet is required, the permit cannot be granted because this change in the width of the buffer will necessarily bring about significant changes in other aspects of the project, and require an entire new round of hydrogeological studies and modeling, the results of which simply cannot be predicted.[18]
B. Analysis.
DEA argues that the department’s rejection of its proposed mitigation measures for the marbled salamander and conclusion that at a minimum, a 640 foot buffer zone for the marbled salamander would be required (and a 1000 foot buffer preferred) is arbitrary and capricious, and unsupported by substantial evidence.[19]
*531 1. With respect to the department’s rejection of DEA’s proposed 250 (or 282) foot buffer zone and “migration corridor,”[20] DEA as the permit applicant had the burden of establishing compliance with the permit criteria. See 310 Code Mass. Regs. §19.012(1). The report of the biologist Scott Jackson, retained by the intervenors, adopted by the letter for E. Heidi Roddis of the Audubon Society, both pointed out that the HA report contains no hard information to support the view that the marbled salamander would successfully use its proposed 250 or 282 foot buffer zone as a migration corridor over which to travel from the breeding pool(s) to upland habitat; these reports also argue that the particular footprint design creates essentially a cul-de-sac from which it may be difficult for the salamanders to emerge and that use of the migration corridor would require the salamander to travel potentially far longer distances to upland habitat than they were accustomed to. It is true that the HA reports from 1993 and 1994-95 do not contain any direct evidence on the success of the corridor concept — rather, HA appears to basé its conclusions about the migration corridor on assumptions. In the circumstances, the department was entitled to. accept the criticisms of Jackson and Roddis about the effectiveness of the corridor and the potential problems with DEA’s proposed configuration of the facility’s western perimeter. The department, in other words, was not compelled to accept the 250 or 282 foot buffer zone as proposed by DEA.
Rejection of the buffer zone width and corridor advanced by DEA, however, does not itself translate into substantial evidence supporting the department’s view that a buffer of at least 640 feet is required, and more appropriately 1000 feet. The department’s decision makes this finding (A.R. ex. S1, p. 11), but it never explains the basis; presumably the finding is premised on the department’s previous quotation, verbatim, of portions of the DFW letter of August 3, 1995, the Audubon Society (Roddis) letter, and the Jackson report. Thus it is necessary to determine if these sources provide the requisite substantial evidence.
The DFW letter is certainly a troubling source of support. The DFW does recommend that 640 feet be the minimum acceptable buffer zone for the area east of the three vernal pools that would be acceptable. (A.R. ex. S13, p. 3.) This recommendation, however, appears to contradict in substantial part the opinions and conclusions that DFW had earlier reached and set out in its 1994 letters. The thrust of those letters is that the mitigation measures proposed by DEA (through HA) — the preconstruction population and movement study; the salamander wall, a naturally vegetated buffer zone to the east of the breeding pool(s) which were located near the western edge of the proposed facility; a post-construction monitoring process for five years — were satisfactory,[21] although the population and movement study was key to locating the salamander wall and determining the relationship of the buffer zone to the facility footprint on its western side. More generally, the earlier letters clearly indicate a view on DFW’s part that the permit could be granted, with conditions, not a position that the permit should be denied because the population study was not yet done. Moreover, as the May 23, 1994 letter shows, DFW was certainly aware before receiving the HA 1994-95 study that the average travel distance attributed to the adult marbled salamander is between 600 and 700 feet, and in the face of that knowledge still recommended a minimum buffer of300 feet. (See A.R. ex. J34.) Thirteen months later, however, DFW changed its view to reject the HA mitigation measures and to insist on a minimum buffer of 640 feet, with no attempt to explain the new position.[22]
The report of Scott Jackson suggests that even 640 feet is inadequate, and, indeed, the minimum buffer zone should be 1000 feet. (A.R. ex. S16, pp. 11, 12.) Jackson finds that 640 feet would be an insufficient buffer because 640 feet is only the average distance traveled by the marbled salamander in the Williams study, the one study on the subject, and if one were to assume that the mean and the median were the same, then 640 feet is only going to accommodate half of the salamanders, in terms of providing a suitable habitat for them. Nothing in the record indicates why this assumption of mean/median parity should be accepted as controlling, or even valid. Nor does Jackson’s later assumption that other species of salamanders in the Ambystoma genus, which appear in some studies to travel on an average greater distances than the marbled salamander,[23] offer substantial evidence that indeed 640 feet is probably understating the average that the salamanders on the DEA property will travel. (It perhaps bears noting that none of the 15 salamanders captured to the east of pool no. 1 was as far as 640 feet from the pool, and the remaining salamander was 350 feet from pool no. 2 and 950 feet from pool no. 1.) Finally, with respect to the recommended 1000 foot buffer, this proposal — at least as adopted by the department (see A.R. ex. S1, p. 11)—seems to come primarily from Jackson’s reading of two studies indicating that juvenile Jefferson and spotted salamanders travel farther distances than do the adults. Given the limited scope and results of these two studies — at least as reported by Jackson[24] — I cannot conclude that they offer a reasonably supported evidentiary basis to designate 1000 feet as the minimum protective barrier is necessary for the marbled salamander.[25] Nor does the record contain substantial evidence supporting the department’s more generalized conclusion that the landfill project, as proposed, poses a threat to the environment in violation of 310 Code Mass. Regs. §19.038(a)(4) because of the inadequate protection offered for the marbled salamander. (See A.R. ex. S1, pp. 11-12.) The department cites as its basis for this result the recommendations of permit denial proffered by DFW, the *532 Audubon Society and Scott Jackson, but does little else in its discussion to explain its reasoning. DFW’s conclusion that the marbled salamander population “will be adversely impacted by the project” is not well supported in its 1995 letter. The letter for the most part criticizes the HA 1994-95 study methodology and then the results as incomplete and insufficient to draw any long-term conclusions about the breeding or migratory habitats of the marbled salamanders on the facility site. DFW played an advisory role in the study’s design, and was made aware of the proposed methodology before the study was begun. In the circumstances, DFW’s criticisms of design and methodology seem unfairly lodged. Moreover, DFW totally misread some of the study’s findings. (For example, DFW draws negative inferences about the value of the study based on the assumed fact that the HA researchers located 16 female marbled salamanders, but no males, when the study actually located 8 males and 8 females.) Finally, and most importantly even if one accepts the criticisms leveled by DFW on the limited information which the HA 1994-95 study provided, an absence of clear evidence that the marbled salamander will be fully protected by the measures proposed does not create affirmative evidence of the opposite, viz, that the salamander will be adversely affected.[26] See, e.g., Salisbury Water Supply Co. v. Department of Pub. Utils., 344 Mass. 716, 721 (1962) (agency’s nonacceptance of evidence does not create substantial evidence to the contrary). Rather, this conclusion seems grounded on speculation alone. Cf. Bays’ Legal Fund v. Browner, 828 F.Supp. 102, 108-09 (D.Mass. 1993).[27]
2. In sum, my review of the administrative record leads me to conclude that (a) there is arguably reasonable evidence supporting the department’s decision to reject DEA’s proposed buffer zone of 250 or 282 feet along the eastern side of the vernal pools which are west of the facility footprint; but (b) such evidence is lacking in support óf the department’s determination that a buffer zone of 1000 foot is required adequately to protect the marbled salamander; and (c) the evidence is a long way from formidable that a 640 foot buffer zone is necessary.[28] In light of this conclusion, it is not necessary to resolve whether, as DEA argues, the department has misinterpreted or misapplied MESA, G.L.c. 131A, §§2 and 4, to the facts of this case. This is so because the department appears to premise its analysis of MESA on DEA’s proposition that the buffer zone for the marbled salamander be limited to 250 or 282 feet, a proposition the department may permissibly reject.[29]
3. As stated above, the evidence in support of the department’s conclusion that at the very least, a 640 foot buffer zone would be required as part of the DEA project is weak. But even if the department could permissibly insist on a buffer of this width, the record demonstrates that the department had no valid basis on which to decide it could not grant a permit with this condition included.
The department states in its decision that it cannot grant a permit because increasing the buffer zone to 640 feet would represent a “major change.” In the department’s stated view, the imposition of conditions concerning an expanded buffer zone around the vernal pools would require significant reconfiguration and design modifications which themselves must be the subject of study and comment, and further hydrological studies would also be needed, rendering the actual nature and scope of the proposed facility unknown, unpredictable and therefore unapprovable. (A.R. ex. S1, pp. 13, 14.) This statement represents a series of conclusory assertions without foundation; nowhere does the department explain why it would be unable to conduct the review as part of the process of implementing the permit conditions. Insofar as reconfiguration and design modifications are concerned, imposition of a 640 foot buffer zone would dictate changes in the size and configuration of only two of the seven proposed landfill cells, or perhaps, as DEA seems to suggest (DEA memorandum, p. 96), simply an omission of the two cells altogether.[30] The proposed facility site would be smaller, and the distance between the landfill and the vernal pools to the east would be increased. Accordingly, no new wetlands or threatened species issues would be raised: the same site is involved, with the disruption caused by the facility moved farther from the designated area of special concern. In the circumstances it does appear, as the regional director of the department suggested, that the impact of the facility on the quantity of groundwater reaching the vernal pools would diminish. (A.R. ex. 2, p. 2.)[31] DEA’s argument is persuasive that the department’s staff has shown in some detail that a permit with conditions to deal with all the matters of reasonable concern related to the marbled salamander and its habitat is eminently feasible. (See A.R. ex. 2, 56, 58.)[32]
The department’s purported inability to issue a permit with conditions because of the resulting uncertainties in revised project design cannot be considered in a vacuum, divorced from the prior history of this case. In both its April 1993 permit denial and its January 1995 partial decision deferring a final permit ruling, the department similarly expressed its inability to approve the permit because it needed more information from DEA. DEA complied with these demands, providing studies, reports, comments and data on all requested subjects. But yet again, what was supplied was not enough for the department; more would be required. Against this background, I can reach no other conclusion but that the department’s denial of the permit based on the conclusory assertion that a larger buffer zone would militate a need for additional studies, a determination not supported by the department’s staff members charged with the substantive technical review of the project, is arbitrary *533 and an abuse of discretion. See Sun Oil v. United States, 572 F.Sup. 786, 815 (Ct. Claims 1978). Cf. MacGibbon v. Board of Appeals of Duxbury, 369 Mass. 512, 519-20 (1976); Quincy v. Planning Board of Tewksbury, 39 Mass.App.Ct. 17, 22 (1995).
4. On consideration of the entire administrative record before me, I must conclude that “the evidence points to no appreciable probability” of the correctness of the department’s decision denying the permit. New Boston Garden Corp. v. Board of Assessors of Boston. 383 Mass. 456. 466 (1981) (citation omitted). Indeed, the “overwhelming probability” (id.) is to the contrary — that is, it points in favor of the granting of the permit with specific conditions to deal with protection of the marbled salamander through a buffer zone, with the water quality and quantity in the vernal pools, with adequate storm water protection, and with all other legitimate concerns the department may have in relation to this threatened species. Cf. MacGibbon, supra. 369 Mass. at 519-20. The record supports the view, expressed by the department’s regional director, that there are “scientific differences”[33] among environmental experts about the size and configuration of a protective buffer zone for the marbled salamander, but agreement that a buffer zone is needed. Clearly, good faith discussions between representatives of DEA and the department need to take place on this issue, and ultimately to arrive at a set of conditions for the permit that will satisfactorily deal with it. A remand to the department with directions to grant the permit with such conditions will be ordered. See MacGibbon, 369 Mass at 520.
II. CAPACITY NEED
A. The Administrative Record
When the department issued the draft permit in September 1992, it concluded that the DEA landfill facility would be allowed to accept up to 1500 tons per day (tpd) of solid waste, in accordance with the site assignment decision issued by the Douglas board of health in April 1987. The draft permit decision also limited the facility to not more than 600 tpd of municipal solid waste, (MSW)[34] for purposes of phase 1 of the four-phase landfill project being proposed by DEA.[35] (See A.R. ex. R7, pp. 7-10; id., fact sheet, pp. 4-5.)[36] In April 1993, when the department denied the permit because of hydrogeological and rare species issues, the department nonetheless reiterated its earlier determination that DEA had met its burden of establishing the need for the facility and, inferentially, that its earlier determination would stand with respect to the 600 tpd of MSW. (See A.R. ex. R24, p. 2; R25, pp. 18-19.)[37] The department did, however, state generally in its decision that any future permit review process in the case might raise new issues or information.
After the case was remanded to the department in December of 1993, the department opened it up for public comment in March 1994, but sought comment only on the outstanding hydrogeological monitoring and rare species issues, not on any question related to facility need. Nevertheless, when the department ultimately ruled on the permit application in January 1995, it concluded that need for the project constituted an open, outstanding issue, along with the discovery of the marbled salamander:
The other outstanding issue involves the need for this project. It is appropriate to use the most recent information regarding the Commonwealth’s need for additional disposal capacity and the impact of new scientific and technological developments, such as landfill mining, which affect that need, to determine how that need should be allocated. [The department] recognizes that it made a tentative allocation for additional municipal and non-municipal solid waste to DEA in its September 1992 draft permit but believes those annual amounts must be reviewed based on current information and policy. The issue of need for disposal capacity is too central to the Commonwealth’s goals of integrated solid waste management and increased recycling, not to do so. [The department] must resolve a significant public policy dilemma: how to balance the rights of an individual applicant against the potential public benefits of the Commonwealth’s waste management policies.
(A.R. ex. J1, p. 2.) The department announced that it would receive public comment about the need for a landfill facility, along with the marbled salamander issue. (Id.)
DEA’s response to the announcement was not positive. It sought an order from the court limiting the department to consideration of the marbled salamander issue, alone, and not facility need. The department indicated that it wished to receive comments on the use of the methodology and assumptions set forth in the then-recent 1994 final update to the Massachusetts Solid Waste Master Plan (1994 master plan update), which had been issued in August 1994, to determine the issue of need for the project. Expressly leaving open whether it would be valid for the department to determine need on the basis of the 1994 master plan update, I concluded that the department would be permitted to request and receive comment on this issue. I also ruled, however, that in light of the “excruciatingly long” histoiy of this case, the department could not permissibly use this next public comment period (the third following the remand order) to solicit comments on use of an entirely new approach to determining facility need, that is, one based on a concept of “landfill project hierarchy” — a policy that would grant permit applications according to a predetermined set of preferences among types of landfill projects. (A.R. ex. S42, pp. 9-10.) The department would instead be required to continue to apply its established policy of “first permit over the line” in connection with the needs analysis in this case, rather *534 than try out a new, and as yet unadopted, approach that would measure the proposed facility against compelling projects. [Id., pp. 10-11.)
The department’s next move was to issue a public notice soliciting comment on, inter alia, whether it would be appropriate to use the data, assumptions and methodology set forth in the draft 1995 solid waste master plan update, (draft 1995 master plan update). More motions were filed in court by DEA. The department argued it was seeking to use the methodology and assumptions in the 1994 master plan update to determine need, but advocated using as well data concerning permits which had been issued since the date of the impending permit decision up to the present. The end result was that the department was permitted to consider, for purposes of determining need, landfill permits issued on or before August 10, 1995, the close of the public comment period, as well as actual closure dates for existing municipal landfills, if different from the dates projected in the 1994 master plan update. Again, however, it was made clear that the validity of the department’s use of the 1994 master plan update and any later information remained undecided.
The department’s final decision of September 22, 1995 reverses its earlier determination that DEA would be permitted to accept 600 tpd of MSW; the department ruled DEA would be permitted to accept 1500 tpd nonmunicipal solid waste (non-MSW) only.[38] According to the department, it calculated whether there would be a need for MSW disposal capacity in 1996 and 2000, designated as the “milestone years," in accordance with the methodology and assumptions used when it issued the draft permit in 1992, but “supplemented with more up-to-date and therefore more accurate information on the availability of landfill and combustion capacity in 1996 and 2000.” (A.R. ex. S1, p. 16.)[39] The department states that use of the most recent data on facility capacity “is consistent with [the department’s] practice of awarding available capacity at point of issuance of a final permit rather than at earlier points in the process such as MEPA review or the issuance of any draft or conditional permits . . .” (A.R. ex. S1, p. 17.)
The result the department comes up with using this method is that in 1996, there is a projected excess MSW capacity of 461,684 tons per year (tpy) statewide, and in 2000, a projected excess capacity of 182,184 tpy. (Id.) Finally, the department indicates in the decision that it rejected DEA’s proposal to factor in a projected 25 percent “co-disposal” rate — that is, an assumption that 25 percent of the total capacity of every MSW facility is devoted to non-MSW, thereby reducing the actual MSW capacity available — because the department did not use such an assumption in connection with the 1992 draft permit. However, if a 25 percent rate were calculated, the department concludes that nonetheless there would still be an excess landfill capacity for MSW in both 1996 (87,630 tpy) and 2000 (80,505 tpy). (A.R. ex. SI, pp. 17-18.) Accordingly, the department concludes that DEA’s facility, if it should ever be built, must be confined to non-MSW only.
DEA challenges this determination on a variety of grounds, including that it is arbitrary, capricious, and an abuse of discretion. The reason that DEA seeks authority to accept MSW is that apparently the “tipping fees” associated with MSW are substantially higher than non-MSW.[40] DEA argues that the projected revenue loss from a total ban on acceptance of MSW comes to $14 million per year, and “with zero MSW, the project is dead.” (DEA memorandum, p. 63.)
B. Analysis
As the department’s decision notes, its regulatory authority to consider the type of waste a landfill facility accepts derives from a provision in G.L.c. 111, §150A which states: “[T]he operating permit granted by the [department] may limit or prohibit the disposal or particular types of solid waste at a facility in order to extend the useful life of the facility or reduce its environmental impact.”[41] While this is a very general statutory mandate, apparently giving the department considerable discretion in making determinations on issues of facility need and disposal capacity, cf., e.g., Brookline v. Commissioner of the Dept. of Envt’l Quality Eng’g, supra, 398 Mass. at 411, I conclude that the department’s decision to eliminate DEA’s ability to accept any MSW at the proposed facility was arbitrary, capricious and abuse of discretion. I reach this judgment for two reasons, discussed below.
1. At the time DEA first applied for an operating permit in 1992, the department followed a policy which appears to have provided that the first permit applicant in line to secure a final permit was entitled to receive the benefit of any estimated MSW disposal capacity need at the time the applicant is “queued” in line. In particular, under this policy if the landfill facility permit applicant secures a draft permit from the department which allows the facility to accept a defined amount of MSW, it seems the department in effect would “reserve” that allocated capacity for the facility when it evaluated other permit facility applications which came before it thereafter, even though the original facility may not have yet secured its final permit. This is the policy variously referred to in documents authored by staff of the department and the Executive Office of Environmental Affairs as “first permit out,” or “FIFO,” or “first in line.” (See A.R. ex. 1; 12; 30; 38; R242; R247; S38B, att. 11 and 14.)[42] (The policy is referred to hereafter as FPO.)
In this case, what the documents in the record reveal is that after DEA obtained the draft permit for its landfill facility in 1992 allowing to accept 600 tpd of MSW, the department applied its FPO policy and in fact considered the 600 tons to be in effect “reserved” for the facility. Thus, in 1993, when the department *535 was reviewing the application for a waste disposal project in Shirley, it described the DEA project, which had received its draft permit six months earlier, as being “in queue” for a final permit, and that accordingly, the department was treating 600 tpd of MSW as reserved for the DEA project when it considered the proposed Shirley facility. (A.R., ex. R242.) Indeed, the department’s formal draft permit for the Shirley facility explicitly stated to the developer that the 600 tpd allocated to the DEA facility would continue to be so allocated, an action which effectively “consume[d] all the need for additional disposal within that region for the year 1996, a milestone year for measuring capacity need." (A.R., ex. S38B, att. 14.)[43] Another internal memorandum about the Shirley project, undated, also discusses the 600 tpd of MSW allocated to DEA and states, “(b]y [department] policy, this is now considered 600 TPD of permitted capacity, and must be accounted for in the period 1994-99 in all needs analyses.” (A.R., ex. S38B, att. 11.)
The department’s denial of the DEA permit application in April 1993 appeared to have brought to a halt any further discussion of disposal capacity need (or any other issue related to the proposed facility) until the fall and winter of 1994-95, when the department, after the remand order in December 1993, was again determining what to do with the permit application. The memorandum dated December 6, 1994 from the Acting Commissioner of the department to the Secretary of Environmental Affairs (see pp. 5-6 above) referred specifically to the FPO policy:
The 1993 permit denial did not address the capacity need question. I believe [the department] has the authority to reopen the matter if public comment is provided for prior to making a final decision. Reopening comment presents significant risks at this point in [the] process. DEA will certainly take the opportunity to argue it is entitled to more tonnage based on [the department’s] own statewide projections. It would also take advantage of [the department’s] current assumption that the project first in line to secure a final permit is entitled to receive all the shortfall need. An alternative approach would institute a permitting hierarchy where mining and expansion projects would receive consideration over a proposal that would despoil open space.
(A.R. ex. 1, p. 3; emphasis supplied.)[44]
Of course, as previously indicated, the department did not grant a permit to DEA in early January 1995, but issued its partial permit decision instead, with its determination to open up for public comment again the issue of disposal capacity and facility need, making reference to its desire to consider replacing the FPO policy with the hierarchy policy mentioned in the December 6, 1994 memorandum from the department’s acting commissioner just quoted. (A.R. ex. J1, pp. 7-9.) Having been precluded from applying a new hierarchy policy to this case by the court’s June 27, 1997 order, the department did not do so. But when the department issued its final decision denying the permit in September 1995, the discussion of the needs issue contained no mention at all of any “reserved” MSW tonnage for DEA based on the draft permit, or of the department’s past policy of honoring the tonnage allocation granted to the first permit applicant in line to secure a final permit. Instead, the department simply characterizes its past policy as one which allocates to the permit applicant, at the time the final permit is granted, the benefit of all the then existing disposal capacity shortfall. Since, however, the department’s review of disposal capacity need in September 1995 indicated there was no shortfall, DEA would no longer be allocated any MSW tonnage. (A.R. ex. S1, p. 17.)
The department’s purported application of its FPO policy in the final permit denial is inconsistent with the actual terms of the policy as the department itself has previously described and presumably implemented it. The department owed DEA the right to have its policies applied consistently and evenhandedly in connection with the permit application; just as the department was not permitted to change to a hierarchy policy in the circumstances, so it could not alter, without explanation, the tenets of its existing FPO policy. See Boston Gas Co. v. Department of Public Utils., 367 Mass. 92, 104 (1975). A fair application of the entire FPO policy suggests that DEA would be entitled to have the 600 tpd of MSW which it was allocated in the draft permit “reserved" as other permit applications were reviewed, and, if DEA’s own permit application were technically satisfactoiy,[45] DEA would be entitled to receive the 600 tpd allocation as part of the final permit.
Consistent with its characterization of the FPO policy in its final permit denial decision, the department argues here that the policy simply means disposal capacity is awarded at the point of final permitting, not at the date of application. (Department memorandum, p. 36.) There is no suggestion in the record, or by DEA, that capacity is awarded at the time of application, so this is somewhat of a red herring. It may be that one piece of the department’s FPO policy includes a review of disposal capacity need at the time of final permitting, and therefore would include consideration of what other landfill or solid waste disposal projects have received final permits up to that point in time. As discussed above, however, it appears that under the policy, the department should have been reviewing those other permit applications with the 600 tpd allocated to and “reserved” for DEA in mind, and also should have remembered that its apparently consistent policy or practice has been to grant a permit applicant the tonnage allocated in the draft permit. (See A.R. ex. 21, quoted in n. 44 above.)
*536 Moreover, despite the department’s protests to the contrary, the extraordinary length of this proceeding — and the passage of time from January to September 1995 — simply cannot be laid at the feet of DEA. The department appeared ready in January 1995 to issue a final permit decision with conditions regarding the marbled salamander (see A.R. ex. 27), but seemingly at the last minute changed course and deferred a final decision pending receipt of salamander movement studies — a course of action that allowed the department coincidentally to reopen the capacity need issue. What the record shows is that in the nine months between January and September 1995, the department’s estimate of capacity need miraculously experienced a sea change, going from a projected MSW disposal capacity shortfall in the year 2000 of 466,000 tpy (according to the director of the solid waste management program, see A.R. ex. 12) or 514,298 tpy (according to the 1994 master plan update, ex. S26, app. G), to a capacity excess of 182,184 tpy (according to the final permit denial, ex. SI, Table l).[46] The department cannot in fairness delay or defer action on DEA’s permit application for reasons of its own, and then point to the passage of time as justifying a change in the basic premises on which the permit was originally going to be granted.
2. Apart from the inconsistent application of its FPO policy, the department’s calculations of disposal capacity need in its final permit decision, when examined against the backdrop of the whole record, are virtually impossible to comprehend.
The department states in its decision that for purposes of its landfill capacity need determination, it is using the methodology and assumptions applied for the 1992 draft permit decision, updated by current (1995) information about permitted solid waste disposal facilities and municipal landfill closures. In a general sense, this appears to be true. Thus, for the 1992 and 1995 permit decisions, the department does seem to have used the same basic methodology, namely, one that calls for: (1) quantification of the amount of MSW generated for the proposed service area; (2) use of “milestone” years on which to focus the calculation of MSW generation and disposal capacity; (3) identification of existing waste disposal sites for MSW, both combustion and landfill, and estimation of MSW tonnage they can accommodate, collectively; (4) application of the established projected waste diversion rates (i.e. the assumption that recycling, including composting, will divert 34% of all MSW in 1996 and 46% in 2000); and (5) subtraction of (3) and (4) from (1) for each of the “milestone” years to determine MSW capacity need — excess or shortfall — in each such year. Put more simply, the fundamental methodology used in 1992 and 1995 can be described by the following formula, to be applied for each “milestone" year.
MSW generation — MSW management (i.e., assumed waste diversion rate plus tonnage capacities of existing landfill and combustion sites) = MSW capacity need.
(Compare, e.g., A.R. ex. R235 with ex. S1, Table 1.)
Beyond this basic formula, however, there were many differences between the two calculations, including: (1) use of statewide data in 1995 rather than regional data, as was used in 1992; (2) application of individual combustion facility (incinerator) use data in 1995 rather than the blanket assumption, used in 1992, that incinerators were operating at 85% capacity; (3) use of 1994 and 1995 incinerator permit and closure data in 1995, which reflected a variety of changes from the data used in 1992; and (4) use of 1995 landfill capacity permit data, again reflecting a changed landscape from 1992.[47]
The use of “updated” information about municipal landfill and incinerator closures as well as about new facilities which received final permits since the 1992 decision on the surface makes logical sense. The difficulty is that the record offers no reasonable explanation of how that data was factored in to come up with the final figures estimating the amount of combustion and landfill capacity which would be available in each of the “milestone” years of 1996 and 2000.[48]
The department’s September 1995 decision contains at its end two charts which purport to account for the differences in landfill and combustion capacity data used in the 1992 draft permit decision and the 1995 final permit denial. (A.R. ex. S1, attachments A and B.) It is not self-evident how this information correlates with the data set out in the decision’s table 1 — a chart which claims to compare the capacity need calculations done in the 1992 draft permit decision to those in the 1995 final permit denial. More important, however, is that the record contains documents prepared in 1994 and 1995 which also estimate landfill capacity for 1996 and 2000, and come up with very different numbers them are reflected in the 1995 permit denial. An explanation of when and why these more recent estimates were superseded by the data in the 1995 decision seems called for, but it is not present.
An illustration of the problem: in its 1994 master plan update, issued in August 1994. the department estimated that for 1996, there would be an excess disposal capacity for MSW of 188,856 tpy, but by the next milestone year of 2000, there would be a shortfall of 514,298 tpy.[49] (A.R. ex. S26, App. G.) In January 1995, the director of the division of solid waste management in the department was clearly projecting a shortfall of MSW disposal capacity for the years after 1996, including the year 2000. (A.R. ex. 30.) And in a memorandum dated July 26, 1995, just two months before the final permit decision was issued, the deputy commissioner of the department forwarded to the Secretary of Environmental Affairs various charts and *537 tables which projected that by the year 2000, the overall capacity need for MSW — that is, the shortfall— would be 376,398 tpy, taking into account new information on municipal landfill closure dates and newly permitted facilities. (A.R. ex. 46, see charts attached at end.) Nevertheless, in its final permit denial, presumably based on virtually the same information, the department estimates, without explanatory comment, that the excess capacity in 2000 will be 188, 184 tpy.
Documents show that the department was performing a significant number of alternative calculations of need in connection with reaching a final decision about the DEA facility. (See, e.g., A.R. ex. 50, 52, S40, 64.) Some of these documents purport to provide some kind of ranking analysis that is nowhere explained, but they do suggest a somewhat intense effort to arrive at a method of calculating facility need that would ensure there was an excess capacity in both “milestone” years of 1996 and 2000.
In sum, the record simply does not offer a reasoned explanation of how the department arrived at the figures it did for disposal capacity need in 1996, and more to the point, 2000. The department may well argue that even if this is so, the 1995 draft and final updates to the solid waste master plan, as well as its 1995 permit decision, show is that the department was consistently estimating an excess capacity in 2000, a fact that cannot be ignored when the DEA facility is considered.[50] There are two flaws in such a claim.
The first is that the 1995 draft and final masterplan updates do not add any meaningful clarity to the issue of how the department arrived at its estimate of an excess capacity in 2000. (See note 50.) The second is the consideration of fairness, averted to previously. (See pp. 45-46.)
The record indicates the issue of disposal capacity need for MSW was reopened in January of 1995 simply because the department wanted the chance to consider application of a new policy or method for awarding disposal capacity to solid waste facilities “in the pipeline,” including the DEA project in particular. (See A.R. ex 1; ex. J1.) I take this view because certainly the department’s own estimates of Statewide disposal capacity at that time were for a reasonably significant capacity shortfall by 2000, to which the DEA facility would have had a claim under the department’s then-operative allocation methodology. (See A.R. ex. 1, 12, 30.) A final permit, with conditions, might well have been granted to DEA in January 1995; if it had been, no issue of need would have arisen. In the absence of a reasoned explanation of how the department traveled from estimating MSW capacity shortfall to capacity excess between January and September 1995, the strong inference one draws from the record is that it has in some manner manipulated the permitting decision process by delay or otherwise until it was able to come up with estimates of capacity excess, and then imposed those new estimates on DEA. This was an abuse of discretion.
The lack of meaningful explanation[51] as to how the department arrived at the disposal capacity need estimates set out in the 1995 permit denial may suggest, as an appropriate remedy, a remand to reconsider the issue of need and supply the missing reasons for its decision. See, e.g., Hamilton v. Department of Public Utils., 346 Mass. 130, 137, 146-47 (1963). See also Boston Gas Co. v. Department of Public Utils., supra 367 Mass. at 104-05. Cf. School Comm. of Chicopee v. Massachusetts Comm'n Against Discrimination, 361 Mass. 352, 354-55 (1972) (where credibility of witnesses is at issue). Here, however, another remand for reconsideration is likely to visit severe prejudice on DEA; the specter of further delay and further decisions subject at least to serious challenge is a real one. See MacGibbon v. Board of Appeals of Duxbury, supra, 369 Mass. at 519-20. See also Quincy v. Planning Bd. of Tewksbury, supra, 39 Mass.App.Ct. 22-23. There will be no remand for the department to revisit its decision. Rather, the department will be required to issue a final permit (with appropriate conditions as to the marbled salamander and other matters) allowing DEA to accept 600 tpd of MSW. Requiring the department to honor the 600 tpd of MSW originally allocated to DEA is a fair resolution in this case. Based on the estimates of capacity need that the department was using in late 1994, early 1995, and even perhaps July 1995 (see A.R. ex. 46, discussed above at p. 49), DEA has an argument that it should be permitted to use more or indeed all of the 1500 tpd allowed its facility for MSW. DEA has also indicated, however, that it is willing to live with the 600 tpd permitted in the 1992 draft permit. (DEA memorandum, pp. 50-51.) This does seem to be a reasonable way to accommodate the rights of DEA to consistent regulatory decision making and fair treatment with what may be a changing picture of disposal capacity need in the Commonwealth.[52]
ORDER
For the foregoing reasons, it is ordered that DEA’s motion for partial summary judgment is allowed. This case is ordered remanded to the department for the issuance of a final construction permit under G.L.c. Ill, §150A for phase 1 of DEA’s proposed integrated landfill facility (1) with reasonable conditions concerning, inter alia, the protection of the marbled salamander and other matters that have been the subject of permit conditions in draft permits prepared by the department previously in this case; and (2) authorizing DEA to accept 1500 tons per day of solid waste, of which up to 600 tons per day may be municipal solid waste.
*541 “. .. the yearly and lifetime capacity potentially created by the proposed facility or expansion in relation to the reasonably anticipated disposal capacity requirements and reduction/diversion goals of the Commonwealth and the geographic area(s) which the site will serve.” [310 Code Mass. Regs. §19.038(2)(a)(11).]
“. . . the extent to which the facility operations, alone or in conjunction with other facilities, maximizes diversion or processing of each component of the anticipated waste stream in order to first reduce adverse impacts and utilize materials and only thereafter to extract energy from the remaining solid waste prior to final disposal.” [Id, § 19.038(2)(a)(12).]
“... the extent to which the facility operations, alone or in conjunction with other facilities, will contribute to the establishment and maintenance of a statewide integrated solid waste management system which will protect the public health and environment and conserve the natural resources of the Commonwealth.” [Id., §19.038(2)(a)(13).]

 What follows is a summary of prior administrative and judicial proceedings in this case and a short discussion of actions taken by the department as well as decisions it has made. The summary is based on the administrative record, but that record is considered in more detail at relevant points in the discussion section of this memorandum of decision.

 The department has previously approved permit applications for the recycling and leaf composting operations.

 A summary of the site assignment proceedings, the State’s review of the project under the Massachusetts Environmental Policy Act (MEPA), the intervenors’ appeal from the site assignment approval by the department, and the early stages of DEA’s construction permit application process is contained in one of my prior decisions in this case. (See Memorandum of Decision and Order on Plaintiffs’ Motion for Partial Summary Judgment (December 9, 1993), at pp. 2-4, included in the administrative record as exhibit S41.)

 The particular species at issue in 1993 were the Northern copperhead snake (Akistrodon contortrix), the wood turtle (Clemmys insculpta) and the box turtle (Terrapene c. car-rolina). The department believed them to be of concern because the intervenors had submitted for the record information that an identified person had seen a snake which be believed to be a copperhead on the site, and another individual believed that the project would adversely affect copperheads, wood turtles and box turtles; there was in the record as well a comment that a box turtle had been found crossing a road in the site in 1983; and also information from the Massachusetts Division of Fisheries and Wildlife (DFW) that documentation had been submitted to DFW concerning the presence of wood turtles on the site.

 DFW is an agency within the Department of Fisheries, Wildlife & Environmental Law Enforcement, under the Executive Office of Environmental Affairs. DFW is charged with administering MESA, G.L.c. 131A.

 Pursuant to an order entered in this case in June 1996, following contested proceedings under the Public Records Act, G.L.c. 66,1 ordered a number of documents, to be added to the administrative record of this case. The quoted memorandum above is one of those so added. These added documents are separately labeled by number, e.g., ex. 1, ex. 2, etc.

 These solid waste allowance provisions were thus the same that were authorized in the 1992 draft permit issued by the department, and were the provisions the department had stated it was still prepared to authorize in April 1993, when it denied the permit on other grounds.

 The three submissions from DFW, the intervenors’ representative and the Audubon Society, respectively, were central components of the 'department’s final decision denying the permit.

 Larval salamanders look like tadpoles. This is the form of the marbled salamander when the salamander egg hatches in the fall. The aquatic larval salamander spends the first winter in the pool where the egg was hatched, and undergoes metamorphosis into the adult, terrestrial salamander form in the late spring or early summer. The fully grown adult marbled salamander grows to approximately seven or eight inches.

 HA’s marbled salamander sampling methods were approved by DFW on August 24, 1994. All the marbled salamanders captured by HA during the study were released as soon as they had been tagged or marked for identification.

 Three pools, located west of the proposed facility site, were identified by DFW as potential breeding pools from which the marbled salamanders might migrate. The largest pool, located closest to the proposed facility footprint relative to the others, is referred to as “pool 1.”

 The shelter board method did not result in the capture or identification of any marbled salamanders.

 The DEA submission on rare species contained the 1994-95 HA study, but also included extensive information on DEA’s proposed ground water protection measures, storm water management plans, and a hydrological modeling report concerning the effect of the landfill facility on surface water and groundwater recharge to the wetland habitats of the marbled salamander and other species. (A.R. ex. S5, tab 4, S6, S7.) These were not a real focus of the department’s 1995 permit denial.

 The 1995 DFW letter also contains a number of criticisms about the DEA submissions concerning the impact of the landfill facility on the quantity and quality of water in the breeding pools. Since the department’s decision denying the permit did not directly deal with the claimed faults in these DEA submissions, I have not summarized DFWs comments on them. The same holds true for comments about water quality and quantity in the report and letter submitted by Scott Jackson and the Audubon Society, respectively, which are described in the text immediately below.

 Jackson states:
I propose that the buffer should be 1000 feet. Given what is known about the capacity of mole salamanders to utilize habitat in excess of 1000 feet from the breeding pool, evidence that indicates that juveniles move farther from breeding ponds than do adults, our lack of population data from the pools, and the threatened status of marbled salamanders in Massachusetts, a buffer of 1000 feet is essential for ensuring that enough upland habitat is available to maintain viable populations of marbled salamanders.
(A.R. ex. S16, p. 12.)

 Thus, the department concludes;
In this Decision, [the department] is denying DEA’s proposed facility design. [The department] considers the design changes which would be necessary for the proposed facility to comply with the cited permit criteria to be major changes to DEA’s application and plans under review for this final decision. If these major changes were made, other areas of the application’s design material would need to be changed substantially. Many areas require comprehensive review and approval by both [the department] and DFW as indicated in the “Response to Comments.” In fact, many of the detailed project design plans drafted by DEA’s consultants would need to be altered dramatically to incorporate adequate mitigation measures so that DEA’s proposal would comply with [regulations defining] permit criteria ... as discussed above. In addition, DEA would need to conduct additional hydrological studies and repeat its modeling analysis. Not knowing how DEA would revise its proposal, [the department] can not draft the necessary changes. Nor can the department grant a permit on condition that DEA revise its plans since it is not evident that the revisions would comply with the permit criteria. [The department] must make its final decision based on the information contained in the current application and the public record. Consequently, applying the statutory requirement that DEA provide [the department] with the necessary environmental reports and the regulatory standard that DEA has the burden to demonstrate compliance with the relevant criteria, [the department] must deny the application.
(A.R., Ex. S1, p. 14.)

 DEA first argues that the department lacked authority to reopen the record for public comment on the marbled salamander in January 1995.1 do not agree. DEA is correct that by that point, it appeared that DFW and the relevant staff of the department itself were satisfied that DEA was proposing adequate mitigation measures for the marbled salamander, and that the necessary base population and movement studies could appropriately be conducted as specified conditions *539 to the permit. As a result, there is force to the argument that the reasons for the department’s determination nevertheless to defer a final permit decision and to reopen the record appear suspect. Nevertheless, this is a different matter from pure legal authority. The discovered presence of the marbled salamander, a threatened species, close to the proposed facility footprint did present a new situation for the department to confront. Moreover, as the department notes, DEA did not object at the time to the reopening for consideration of the marbled salamander question; its challenge was to the reopening to reconsider the facility need issue.

 DEA’s mitigation measures of course were not limited to creation of a buffer zone/migration corridor. In addition, DEA proposed the salamander wall to surround the relevant portions of the facility footprint as well as a complete perimeter fence. The department does not reject these two latter measures, but in effect concludes that they are inadequate when combined with a buffer zone of 250-282 feet.

 The department’s Acting Commissioner certainly read the 1994 DFW letters that way. (SeeA.R. ex. 1.)

 DEA asserts that the DFW 1994 letters specifically approved the concept of a migration corridor. I do not read them as doing so, although the generally favorable view of the mitigation measures being proposed might imply such approval. Nevertheless, at a minimum one would reasonably expect DFW to discuss in its 1995 letter why the idea of a migration corridor is not acceptable.
The department argues that DFWs 1995 position was dictated by the fact that 15 of the 16 marbled salamanders located by HA in 1994-95 were traveling east toward the proposed facility footprint. This fact, however, does not explain why DFW rejects the idea that the salamander can use a less wide buffer zone and a corridor to other habitat. DEA, in its response to the DFW letter, states that the specific points of capture of these salamanders suggests they were following the natural swale at the location of the drift fence, which would ultimately lead them away from the facility-footprint. (A.R. ex. S15, pp. 11-12 n.5, 14.) There is no indication the department took any portion of DEA’s specific, detailed response to the DFW letter into account; there is no mention of it at all in the department’s decision.

 In fact, of the studies cited by Jackson, only two of four done of Jefferson salamanders are described as showing an average distance over 640 feet — the other two show averages of 126 and 220 feet, respectively — and only one of four done of spotted salamanders are stated to show an average distance exceeding 640 feet, the other three averaging 220, 212 and 250, respectively. (See A.R. ex. S16, p. 12.)

 As reported by Jackson, one of the studies indicated that of five adult Jefferson salamanders studied and an unidentified number of juveniles, the average travel distance was less than 248 feet for the adults and more than 248 feet for the juveniles, and of five adult spotted salamanders and an unidentified number of juveniles, the adults traveled an average of less than 250 feet and the juveniles an average of greater than 250 feet. The other study showed that of 6 adult Jefferson salamanders and an unidentified number of juveniles, the average distance of the adults was 126 feet and the average of the juveniles was undetermined; and of 2 adult spotted salamanders and 1 juvenile, the average distance for the adults was 220 feet and the average distance for the one juvenile was more than 660 feet. (See A.R. ex. S16, p 12.)

 The department, and Jackson, also cite to evidence that individual marbled salamanders have been documented as traveling greater distances than 640 feet. Nothing is provided as to how many such individual salamanders are at issue; as indicated previously, the working average of 640 feet is itself based on a study of only 12 marbled salamanders.

 Again, DEA’s comments about the 1995 DFWletter (A.R. ex. S15) offer a reasoned rejoinder to points advanced in that letter, which the department was under an obligation to consider. See Cohen v. Board of Registration in Pharmacy, 350 Mass. 296, 253 (1966). Accord, D’Amour v. Board of Registration in Dentistry, 409 Mass. 572, 584 (1991).

 The Audubon Society letter does not offer any more evidence. The department cites, presumably as factual support for its conclusion, the so-called finding by Heidi Roddis that “some individuals within the [Marbled Salamander] population . . . will be adversely affected by the project.” (A.R. ex. S1 p. 12.) This “finding” is based on conclusory statements about studies, none of which is cited in the letter. Finally, with respect to Scott Jackson, his recommendation of denial appears to be grounded in a variety of highly questionable assumptions and conclusions. Both he and Roddis state, and the department picks up in its decision (see A.R. ex. S1, pp. 11, 13), that the salamander has an affinity to return to the same area each year after breeding — a point of some relevance to Jackson and Roddis since they view the HA 1994-95 study as revealing the salamanders to be returning to the facility site for upland habitat. This statement is said to be based on studies, but the only study mentioned (by Jackson, since Roddis never gives the names or authors of any studies) is the Williams study, which is described as indicating that one marbled salamander (of an apparent total of 12) returned to the same spot for two years in a row. (See A.R. ex. S16, pp. 10, 11.) Perhaps more to the point, no evidence is presented to suggest that the marble salamander’s well-being will be threatened if it cannot return to the same area each year. Furthermore, Jackson speaks of the potential for increase in adult mortality, and increased exposure to predation and desiccation — another point picked up by the department (see A.R. ex. S1, p. 14). From all that appears in his report, this statement by Jackson seems speculative at best, and without any substantial evidentiary support. Jackson’s criticism of the proposed salamander wall also lacks reasonable eviden-tiary foundation. HA provided some detailed information about the operation of the salamander wall with which it had experience in New Jersey, and offered a reasoned conclusion, based on its experience and the details of its monitoring, that the wall had some success in providing protection to the marbled salamander. (See A.R. ex. J44, tab 6.) Jackson cites one oral comment, without date or context, by a staff member of the New Jersey Division of Fish, Game and Wildlife, that the wall was “not a success story,” to show that the wall will not serve its intended protective and deflecting purpose. This is not substantial evidence.

 The 640 foot buffer zone is discussed more fully below, see pp. 31-34 infra. For reasons stated there, even a requirement of such a buffer zone does not justify denial of the permit.

 Nevertheless, I do note that the validity of the department’s interpretation of §2 of MESA in particular in this case is questionable. Section 2 prohibits the “taking" of endangered or threatened species, and the “altering” of their “significant habitat.” The term “take” is defined in c. 131A, §1 as follows:
‘Take," in reference to animals, to harass, harm, pursue, hunt, shoot, hound, kill, trap, capture, collect, process, disrupt the nesting, breeding, feeding or migratory activity or attempt to engage in any such conduct, or to assist such conduct, and in reference to plants, to collect, pick, kill, transplant, cut or process or attempt to engage or to assist in any such conduct.
See also 321 Code Mass. Regs. §10.02. While the department asserts that a taking is involved in the DEA proposal because the evidence shows that the project will “disrupt the . . . breeding, feeding or migratory activity” of the marbled salamander, DEA argues with some persuasive force that this interpretation stretches the meaning of the single quoted phrase in the definition of “take” beyond its intended scope. This language must be read in the context of the whole *540 definition, which seems to bespeak of direct, focused and intentional action rather than a more passive, indirect effect, especially when the term “take” is compared with MESA’s definition of “alter.” “Alter,” means “to change the physical or biological condition of a habitat in any way that detrimentally affects the capacity of the habitat to support a population of endangered or threatened species.” G.L.c. 131 A, §1. “Alter” is thus broader than “take,” including within its reach conduct with both direct and indirect effects on designated species. As stated at the outset, §2 of MESA prohibits persons from “taking" threatened or endangered species, but it also bars persons from “altering” “significant habitat.” This last term, “significant habitat,” refers to areas which the director of DFW specifically designates as such because of special biological or physical features or particular threatened or endangered species. DFW has not designated any part of the DEA property in Douglas as “significant habitat,” and thus MESA imposes no prohibition on DEA against “altering” the site. When these various terms are reviewed together, DEA’s proposed landfill project may arguably be said to “alter" the site in some ways in connection with the marbled salamander, — although the affirmative evidence of detrimental impact is thin — but it is doubtful that the project results in a “taking" of the marbled salamander. Compare Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 132 L.Ed.2d 597, 610-15 (1995) (upholding regulation under Federal Endangered Species Act which defines the word “harm” in statutory definition of “take” to include “significant habitat modification or degradation where it actually kills or injures wildlife ...”). It is significant that DFW, the agency charged with implementing and enforcing MESA, does not suggest in its 1995 letter or in any other document included in the record that the proposed landfill would constitute a "taking" of the marbled salamander. Certainly the department’s different interpretation of a statute it does not enforce is not entitled to deference. Cf. Simon v. State Examiners of Electricians, 395 Mass. 238, 245, 247 (1985) (administrative interpretation of governing statute entitled to little respect where it is neither contemporaneous nor consistent).
Finally, even if the department’s expansive and generous interpretation of “take" is accepted, as the discussion in the text indicates, the conclusion that the DEA landfill project, with all the conditions and mitigation measures being proposed in place, will affirmatively “disrupt the nesting, breeding, feeding or migratory activity” of the marbled salamander is essentially a speculative guess, not grounded in established facts.

 The landfill project calls for the individual cells to be developed and put into operation sequentially, moving from east to west. Accordingly, the two cells which would be affected by a 640 foot buffer zone, which are at the western portion of the site, would be the last ones scheduled for construction.

 On the question of groundwater, DEA argues with good support in the record that DFW and other critics of DEA’s submitted groundwater studies have missed the mark. It appears that the groundwater recharge modeling analysis ultimately does include all three vernal or ephemeral pools, and, contrary to DFW statements, predicts an increase rather than a decrease in groundwater recharge even with a 250 foot buffer zone. (See A.R. ex. S15, tab 1.) More to the point here, the department’s internal hydrogeological review group, led by Bruce Bouck, appears to have concluded that the “hydrogeological regime” (A.R. ex. 56) at the site, including ground water and surface water quality and quantity, is monitorable and any unanswered questions the group had concerning the DEA groundwater modeling analysis could be answered through permit conditions. (A.R. ex. 56, S11.)

 DEA also convincingly argues that the site reconfiguration which would be required with a larger buffer zone can adequately be addressed as permit conditions, and that the department’s refusal to deal with all these issues as permit conditions rather than grounds for denial is inconsistent with its treatment of other projects. (See DEA memorandum, pp. 25-28, 30-34.) On this score, see Puerto Rico Sun Oil Co. v. United States Envt’l Protection Agency, 8 F.3d 73, 77 (1st Cir. 1993) (discussing “rules of thumb” pertaining to definition of arbitrary and capricious agency action; to avoid being arbitrary and capricious, agency decision must, inter alia, discuss relevant issues, show consistency with past practice and avoid unexplained discrimination).

 See A.R. ex. 2, p. 2, also quoted more fully on p. 9 above.

 MSW consists of residential trash from homes and commercial waste generated by businesses and institutions.

 As stated at the outset, phase 1 of the project is the only phase that has ever been at issue in this permit proceeding.

 With respect to the limitation on MSW disposal to 600 tpd, the department stated in the 1992 decision:
The procedure used to establish the limitation on the amount of municipal solid waste (MSW) permitted for disposal is consistent with the methodology, analytical assumptions and statewide waste diversion goals applied by the [department] in its MEPA review and site assignment appeal decision. The six-hundred (600) ton per day limit of MSW was calculated based upon estimates of the net availability of necessary landfill disposal capacity during the term of Phase-1 operations within the service area specifically delineated by the Applicant. . .
(A.R. ex. R7, fact sheet, pp. 4-5.)

 The department stated:
The permit proponent was provided with instruction to follow the established Department methodology in analyzing need for the project. The Applicant followed the Department’s established methodology and the Department is satisfied with the Applicant’s needs analysis and the numbers used in the needs analysis. The proponent made use of current and reliable data and was not compelled by the Department to anticipate future permitting activity (of other solid waste disposal facilities) by the Department in analyzing need for the proposed facility ...
(A.R. ex. R25, p. 18 (“Summary Response to Comments, Final Permit Decision/Permit to Construct Landfill”].)

 Non-MSW includes waste not normally generated by residences, businesses and institutions (e.g., construction and demolition waste and debris); nonrecyclable or noncombustible MSW (e.g., bulky furniture); excess MSW which existing combustion facilities cannot handle; and residue from recycling, composting and other waste processing operations. During all the time the department was considering DEA’s permit application, it did not regulate the amount of non-MSW that a facility could accept; the department’s draft 1995 master plan update, issued on June 29, 1995 and proposing to examine disposal capacity need for both MSW and non-MSW, was, as its title indicates, a draft. The 1500 ton limit is a function of the town of Douglas’ site assignment decision. (See A.R., ex. S1, p. 17 n. 15.)

 The department used the tonnage capacities established in final permits or consent orders for other landfill projects which had been issued between the 1992 draft to DEA permit and August 10, 1995, as well as adjusted closure dates for unlined municipal landfills. It also replaced a “blanket assumption” used for the 1992 draft permit that combustion facilities would be operating at 85% capacity with “facility specific information about availability reported for 1992.” (A.R. ex. S1, p. 17.)

 DEA submitted evidence estimating the difference to be approximately $30 per ton. (A.R. ex. S38b, att. 8.) This figure translates into an estimate that eveiy ton of waste which is shifted from MSW to non-MSW results in an annual loss of $10,000. (Id.)

 Pursuant to this statutory authority, the department has issued implementing regulations that are very broad in scope they provide that the department shall consider, in reviewing a permit application:

 The memorandum of decision and order dated June 27, 1995 in this case (S42) makes reference to the department’s policy of “first permit over the line.” The reference was to the policy described in the text above, although at the time I was not aware of how it operated in detail — I was simply commenting on the suggestion in the department’s January 13, 1995 partial decision that it was considering dropping its previous policy, which had been described to me as one keyed to the time of the permit application and review, to one which would evaluate proposals according to a hierarchy of preferred types of landfill projects. In its September 20, 1995 permit denial decision, the department,states that my reference to the “first permit over the line” policy was describing a practice of the department under which it awards “available capacity at point of issuance of a final permit rather than at earlier points in the process such as MEPA review or the issuance of any draft or conditional permits.” My reference was not meant to describe this “practice” at all. At the time, I did not have any detailed information available from which to determine what the specifics of the department’s policy or practice was.

 Despite this fact, the department gave the Shirley facility a draft permit because of special considerations not relevant here.

 A similar reference to the fact that 600 tpd of MSW were being allocated to DEA in accordance with the “FPO” rule appears in a memorandum from the director of the department’s division of solid waste management to the Acting Commissioner and others on January 12, 1995, just one day before the department issued its partial permit decision deferring again any final permit-determination. The memorandum provides a summary of discussions taking place within the department about the issue of capacity need analysis. It states, ”[t]he group [of officials involved in the discussions] assumed for the purpose of its discussion that we would continue to follow the Final Permit Out [FPO] rule for allocating tonnage. On that basis, the decision order on the commercial sites was [DEA] (600 tpd), Plainville ... Barre . . . Fairhaven .-. . Hudson/Stowe . . . Granby . . . CHL . . . Given the above status and assumptions the group played out various permit scenarios. In this exercise it appeared that [DEA], Plainville and Fairhaven would consume all the available capacity through 1997 when Plainville will reach capacity in Phase One. Under that scenario, [DEA] under FPO and Fairhaven as a demonstration project would receive their full permitted tonnages . . .” (A.R. ex. 30.)
Also of relevance is a memorandum from the department’s assistant general counsel to the acting commissioner, in which she stated:
In past permit applications, [the department] has not granted a permit for future disposal capacity. Rather, [the department] has calculated the disposal need using a needs analysis based on the current disposal need. Typically no analysis is computed for smaller landfills below MEPA thresholds. [The department] has not reviewed a permit application after a project has completed the MEPA process (in which [the department] consistently commented that a needs analysis is not appropriate at that time), but plans to calculate the need at the draft permit stage in accordance with the latest needs calculation [The department] also has not issued a draft permit and changed tonnage for the final permit It seems as though the needs analysis is a negotiated process in which the applicant and [the department] try to reach an agreement at the draft permit stage.
(A.R. ex. 21, final page; emphasis supplied.)

 Obviously the department did not find the DEA permit application to be technically sufficient; the permit was denied on account of the marbled salamander. But the department went out of its way to reach the disposal capacity need issue, and therefore I review it, since I have concluded that the department is obligated to issue a permit with conditions relating to the marbled salamander.

 The year 2000 is one of the “milestone” years the department uses in calculating disposal capacity in both the 1994 master plan update and its September 1995 permit decision. The other “milestone” year, 1996, appears to be essentially moot. (See note 49 below.)

 Moreover, as DEA points out, even though the department used data from 1994 and 1995 in the 1995 decision, it declined to use in its calculation the assumption, which by 1994 the department had accepted, that an identifiable percentage of non-MSW is disposed of at MSW landfill facilities, thus reducing the available capacity of the facility to accept MSW itself. (In the 1994 master plan update, the department accepted that non-MSW is disposed of at MSW disposal facilities, and assumed that 675,000 tpy of non-MSW — ten percent of the 6.75 million tons of MSW estimated to be generated each year — would be so disposed, with the corresponding reduction in available disposal capacity for MSW.) Nevertheless, this action on the department’s part would appear to have little significance. In its 1995 decision, the department does add a calculation which is designed to reflect an estimate that 25% of the available landfill capacity would be devoted to the disposal of non-MSW, and still concludes there is an estimated excess disposal capacity in 1996 and 2000. This is a different method of accounting for co-disposal than the department used in its 1994 master plan update, but there is no indication it is not a reasonable one; the department remarks that the 25% co-disposal figure “closely resembles” reported information from operators at MSW landfills in 1994. (See AR. ex. S2, p. 10 n. 6.)

 There is no doubt about the source of the overall MSW “generation" figure used in each milestone year, namely, 6.75 million tpy. This is the overall statewide estimate that the department has been using for a good number of years — accompanied by an assumption that the net rate of MSW generation will not change from year to year — and is not questioned by any party here. Nor is there any mystery about the source of the recycling figure used. At least since 1992, the department has adopted the assumption that by 1996, 34% of MSW generated would be recycled, and that the annual percentage increase for recycling would be 3%, for a total of 46% in 2000. Again, despite the fact that actual recycling rates for the Massachusetts cities and towns taken *542 as a whole do not appear to have kept pace with this assumption, it is not questioned by any party in this case.

 The 1994 master plan update as well as the department’s 1995 permit decision both use 1996 and 2000 as the milestone years, .and no criticism has been leveled at this choice. However, it would seem reasonable to assume that even at the time of the department’s January 1995 partial permit decision, if a final permit had been .. . then, the DEA landfill facility could not have been operative at any point before sometime in 1997 at the earliest. Thus, the capacity estimates for 1996 appear to be essentially moot some time ago, and at least by the date of the final permit decision in September 1995; by definition, they are moot at the present time. Thus the figure that seems far more relevant to review is that pertaining to the milestone year 2000.

 Included in the record are copies of the department's 1995 draft and final updates to the Massachusetts solid waste management plan, dated June 29, 1995 and December 7, 1995, respectively. (AR. ex. S27, S28, 68.) These documents do project an excess of MSW disposal capacity for 2000, as well as for 1996. Nevertheless, they also reflect a different methodology for evaluating capacity need at least for the year 2000; for the first time, the department considers capacity and need for both MSW and non-MSW, and in any event, in an earlier decision I ruled that the department could not use any of the assumptions or methodology set out in the 1995 draft update in connection with its decision about the DEA permit — the final 1995 update was not yet available — because it would be unfair to do-so. (See A.R. ex. S24.)
Even if the 1995 draft master plan update were to be considered, its application to this case is also too confusing to understand, in my view. The draft update projects an excess capacity for MSW of 319,230 in 2000. One of the department’s analyses of capacity need for the DEA facility, however, dated August 17, 1995, includes a draft projection of MSW disposal need in 2000, based on the 1995 draft master plan update, to be 240,771 tpy. (A.R. ex. 50.) Another analysis prepared by the department a week later projects for the year 2000, based on the 1995 draft update, an excess of 319,000 (representing a rounded figure). (A.R. ex. 52.) This latter figure seems to correspond to the draft update, but then what is the former? Moreover, how the 1995 draft update arrived at its estimates, given the estimates of MSW capacity need in the 1994 final update issued ten months earlier, remains an enigma. It may be accounted for by virtue of the fact that the department was embarking on the use of a new, combined solid waste methodology in 1995, but that is not clear.

 The decision does purport to explain in some detail the differences between the 1992 and 1995 capacity need calculations, but it offers nothing on differences between the calculations set out in the 1995 permit decision and other calculations and estimates of capacity need the department made in 1994 and earlier in 1995.

 The intervenors argue that if the department’s permit denial is reversed, I should order the case remanded to the department for consideration of a “critical but unresolved” issue concerning the late identification of a “fault" running through the middle of the proposed facility site which, the intervenors claim, has the potential to carry contaminated water offsite and into public and private water supplies downhill. (Intervenors’ memorandum, pp. 38-42.) For the reasons stated in the department's surrebuttal memorandum, I am persuaded that the department could validly determine that this issue, one of hydrogeological monitoring, could be adequately addressed as a condition to the permit. (Department surrebuttal memorandum, pp. 8-12.)
Finally, my conclusion that a permit, with conditions, is to be issued makes it unnecessary to reach the arguments advanced by DEA that the department’s permit denial results in a governmental taking of DEA’s property.